# EXHIBIT A

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 2 of 66

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x

CATHERINE CURRAN-GROOME,
BRANDON MURPHY, AIDAN PARISI,

      Plaintiffs,

                    - against -

COLUMBIA UNIVERSITY,

Defendant.

-----------------------------------------------------------------------x

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney within 20 days after service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is that both parties reside or are based in New York County and the acts complained of took place here.

Dated:

/s/ Jonathan Wallace
Jonathan Wallace
PO #728
Amagansett, NY 11930
917-359-6234
jonathan.wallace80@gmail.com
Attorney for Plaintiffs

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
 ------------------------------------------------------------------------x
CATHERINE CURRAN-GROOME,
BRANDON MURPHY, and AIDAN PARISI,

       Plaintiffs,

                - against -

COLUMBIA UNIVERSITY,

Defendant.

 ------------------------------------------------------------------------x

**CATHERINE CURRAN-GROOME, BRANDON MURPHY, AIDAN PARISI,** Plaintiffs, by
their attorney Jonathan Wallace, for their Complaint, state:

## PRELIMINARY STATEMENT

1. Plaintiffs Catherine Curran-Groome ("Curran-Groome"), Brandon Murphy ("Murphy"),
   and Aidan Parisi ("Parisi"), bring this action for breach of Tedeschi Rights as defined
   below, New York State's landlord-tenant laws (Article 7 of the Real Property Law and the
   Multiple Dwelling Law), Title VI, New York's Human Rights Law, Breach of Contract,
   Negligence, Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional
   Distress, and other claims against Defendant Columbia University ("Columbia"), to
   recover damages and other relief for Columbia's willful misuse of its student conduct
   system to discriminate against, harass, endanger, and deny their Tedeschi Rights to
   Plaintiffs.

2. "Tedeschi Rights" refers to the rights granted to Parisi, Murphy and Curran-Groome as

2

Columbia students as recognized in the case of *Tedeschi v. Wagner College* (1980).

3. "Doxxing" means publishing an individual's personally identifying information without their consent.

## THE PARTIES

4. Parisi is a first-year Master's of Social Work student at Columbia University. Prior to their one-year suspension, Parisi was scheduled to graduate in May 2025.

5. Murphy is a first-year Master's of Social Work student at Columbia University. Prior to his one-year suspension, Murphy was scheduled to graduate in May 2025.

6. Curran-Groome is a Master's of International Affairs student at Columbia University. Prior to her two-year suspension and full-scholarship revocation, Curran-Groome was scheduled to graduate in May 2025.

7. Columbia is a private university chartered by the State of New York.

## JURISDICTION AND VENUE

8. Jurisdiction and venue are proper in New York County because the defendant is located here and the events complained of took place here.

## FACTS

### Columbia University's Rules, Policies, and Internal Governance

#### *Charters and Statutes*

9. Upon matriculating, students at Columbia University ("the University") are given a copy

3

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 5 of 66

of the University's Charters and Statutes.[1]

10. The Charters and Statutes are Colombia's "primary administrative code."[2] The Statutes specify the academic and administrative structure of the university, and outline the duties of the president, senate, deans, and other academic officers.

11. The Charters and Statutes establish the office of the University President, which is delegated authority, *inter alia,* "to exercise jurisdiction over all the affairs of the University" and "to administer discipline in accordance with the Statutes of the University and the rules promulgated pursuant thereto." Charter & Statutes § 2.

12. As such, the University President does not have authority to set policy.

13. The Charters and Statutes also establishes the University Senate, composed of members of the administration, faculty, student body, and affiliated institutes.

14. The Senate is exclusively charged with setting University policy pursuant to the school's Charters and Statutes, including by "promulgat[ing] a code of conduct for faculty, students, and staff and provid[ing] for its enforcement."  *Id.* at § 23.

### *Rules of University Conduct*

15. The Rules of University Conduct ("Rules") emerged from the student protests of 1968, which led to the arrests of over 700 students and over 140 injuries. Following those protests, the Columbia University Senate adopted the Rules and created the Committee on the Rules of University Conduct to oversee them.

16. Any amendments to the Rules need the approval of both the University Senate and the

---

[1] Charters & Statutes, Jan. 2022 ed. *available at*,
https://secretary.columbia.edu/sites/default/files/content/University%20Statutes_January2022.pdf.
[2] Office of the Secretary, "Governing Documents," Columbia University,
https://secretary.columbia.edu/content/governing-documents.

4

Trustees of the University. Charters & Statutes, §§ 23(j), 26.

17. These Rules operate as, and analogously to, a binding contract, outlining the student's and school's mutually enforceable obligations.

18. The Rules state that, "In accepting membership in Columbia University's community, *we agree to be bound by*, and to honor, the Rules." Guidelines for the Rules of University Conduct, prepared by the Rules Committee, last reviewed and updated Nov. 6, 2020 (emphasis supplied).

19. The Rules have four main sections. The Affirmative Statement in the first section (§440) emphasizes Columbia's commitment to freedom of expression for every member of the University and the right to openly demonstrate, rally, picket, and circulate petitions, even in support of ideas thought to be "offensive, immoral, disrespectful, or even dangerous" since "free expression would mean little if it did not include the right to express what others may reject or loathe." Section two (§441-§443) provides reasonable time, place, and manner restrictions on acceptable forms of protest by detailing 20 activities that constitute violations of the Rules. The third section (§444-§445) defines how demonstrations should be managed by the University, outlining official duties and roles for that purpose. The final section (§446-§451) describes institutional disciplinary procedures and the due process protections for alleged violators of the Rules.

20. Administration of the Rules is primarily overseen by the Rules Administrator, who is appointed by the University President. *Id.* at § 445(a). Hearings are overseen by the University Judicial Board ("UJB"), a five-person panel composed of University students, faculty, and staff. (Persons in disciplinary roles are explicitly forbidden from being on the UJB.) *Id.*

5

21. Under the Rules, the Rules Administrator and UJB have exclusive jurisdiction over conduct "incident to a demonstration." As the current Guidelines to the Rules note:

    i.    The Rules of University Conduct apply, by their plain terms, "to all members of the University community" and "to any demonstration, including a rally or picketing, that takes place on or at a University facility or at any University sponsored activity" (§442). Both the history of the Rules and the language of §442 support the conclusions that (1) any University regulations of demonstrations or other policies regulating or restricting freedom of expression must be consistent with the Rules; and (2) the Rules are the fundamental source of authority within the University for regulating or otherwise restricting conduct "incident to a demonstration" (§443.a). Accordingly, any complaint that a member of the University community has engaged in prohibited conduct that arises out of, or is related to, a demonstration shall be directed to and reviewed by the Rules Administrator, and resolved under the Rules process, consistent with applicable law and the Statutes of the University.[3]

22. Section 446 of the Rules sets forth the rights of respondents in disciplinary proceedings, including the right to respect, dignity, sensitivity, and adequate support from the school, the right to the presence of an advisor throughout the disciplinary process, the right to be notified as soon as possible once a violation is reported, the right to decline to participate in the investigation process, the right not to self-incriminate, the right to a prompt

---

[3] Columbia University Senate, Guidelines to the Rules of University Conduct, Endorsed August 23, 2024, p. 3-4, *available at* https://senate.columbia.edu/sites/default/files/content/Committee_Rules%20of%20University%20Conduct/US_The%20Guidelines%20to%20the%20Rules%20of%20University%20Conduct_Endorsed%2020240823.pdf

investigation and hearing, and the right to adequate time to review documents and prepare one's defense. *Id.* at § 446. The school also sets out a detailed timeframe for resolving reports of misconduct within two months. *Id.*

23. Sanctions for violations must be "[f]air and appropriate given the facts of the particular case, [...c]onsistent with the University's handling of similar cases, [...and a]dequate to protect the safety of the campus community." *Id.* at § 449.

24. Notably, the Rules do not have any provisions authorizing a student's interim suspension prior to the UJB's final determination.

### *"Standards and Discipline," "Dean's Discipline," and CSSI*

25. In or around 2019, the University created an alternative student discipline process to address other forms of student misconduct. Known as the "Dean's Discipline," the procedure is outlined in a policy document titled "Standards and Discipline." *See* Center for Student Success and Intervention, "Standards and Discipline."[4]

26. Upon information and belief, a copy of "Standards and Discipline" was not provided to the plaintiffs upon matriculation.

27. Around 2021, the University President created the Center for Student Success and Intervention ("CSSI") to enforce this new policy. *Ibid.* CSSI may pursue disciplinary action for 41 different types of "behavioral" and "academic" misconduct, none of which relate to protest activity. *Id.* at p. 3.

28. Students charged with violations of the "Standards and Discipline" policy by CSSI are

---

[4] 9/23/2024 ed. *available at*
https://cssi.columbia.edu/sites/default/files/content/Standards%20and%20Discipline%202024-25.pdf; 08/28/2023
ed. *available at* https://cssi.columbia.edu/sites/default/files/content/StandardsandDiscipline_0.pdf.

7

given substantially fewer due process protections than those charged with violations of the Rules by the UJB and Rules Administrator. Under CSSI's process, students are *required* to comply with the investigation and are not permitted to have an attorney, call witnesses, or make opening or closing statements in their hearings, unlike in UJB hearings. They are also not given the same protections requiring a prompt hearing, adequate notice, and time to prepare their defense.

29. CSSI's proceedings are overseen by University staff accountable to the President, unlike the UJB, which is composed of and accountable to a democratically elected body in the University Senate.

30. Under the policy, CSSI is authorized to issue penalties up to and including expulsion, provided that they are "[a]dequate to protect the safety of the campus community and/or the integrity of the academic environment." *Id.* at p. 22.

31. Unlike disciplinary procedures under the Rules, the policy also authorizes CSSI to place students on "interim" suspension.

32. However, "Standards & Discipline" only permits CSSI to issue interim suspensions if "the student's behavior may make their presence on campus a danger to the normal operations of the institution, the safety of themselves, others, or to the property of the University or others." *Id.* at p. 14.

33. The "Standards & Discipline" document does not transfer any jurisdiction away from the Rules Administration and the UJB, which still has exclusive jurisdiction over conduct "incident to a demonstration."

34. Nonetheless, in November 2023, in response to demonstrations against the war on Gaza at the University, the University President transferred primary jurisdiction over student

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 10 of 66

disciplinary proceedings related to protests at Columbia from UJB and the Rules Administrator to CSSI, in violation of the Charter and Statutes.

### *Interim Policy for Safe Demonstrations*

35. On February 20, 2024, the University notified students by email of its new Interim Policy for Safe Demonstrations ("Interim Policy").

36. The Interim Policy was adopted by the administration after "consultation" with the Executive Committee of the University Senate, which included then-President Minouche Shafik ("President Shafik") and interim Provost Dennis Mitchell.

37. The policy was not approved by the full University Senate, as required.[5]

38. The policy placed new restrictions on demonstration permits, including requirements that they be held in designated "Demonstration Areas" during "Regular Demonstration Times," and directs that complaints be sent to CSSI, "as directed in the University's Standards and Discipline Policy," rather than the Rules Administrator and UJB as directed by the Rules of the Charter and Statutes.

39. According to an email sent to all University students that month, the policy was "intended solely for violations of time/place/manner of the Interim University Policy for Safe Demonstrations policy and NOT for Rules of Conduct violations. Rules of Conduct violations will be handled as outlined in the Rules of University Conduct policy."

40. This is misleading, because under the University's Charters and Statutes, time/place/manner restrictions traditionally fall squarely under the Rules procedures, and

---

[5] Sarah Huddleston, "Columbia establishes 'Demonstration Areas' and times, alters disciplinary procedure for students," *Columbia Spectator,* Feb. 19, 2024, *available at* https://www.columbiaspectator.com/news/2024/02/19/columbia-establishes-demonstration-areas-and-times-alters-disciplinary-procedure-for-students-in-violation-of-new-event-policy/; Charters and Statutes, §§ 23-25.

9

are <u>never</u> handled by CSSI.

41. In terms of sanctions, the policy recommended a written warning for a student's first two violations, followed by a referral to the UJB within ten days of the student's third violation, "with decisions rendered in line with the UJB time frame."

### *University Senate's Objections to CSSI's Jurisdiction*

42. On April 15, 2024, the University Senate's Rules of University Conduct committee sent a letter to University General Counsel Felice Rosan, requesting clarification on CSSI's process and rules for pursuing disciplinary actions against students involved in protest and demonstration activity. The letter raised concerns about the legitimacy of CSSI's authority to discipline students for their involvement in protest activity, asserting that protests have historically been regulated under the Rules of University Conduct since its creation following the 1968 antiwar and anti-gentrification protests.

43. On April 18, 2024, over one hundred Columbia University and Barnard College students were arrested while engaging in peaceful protest on one of the only designated demonstration areas - one of the campus lawns.

44. The decision by the University administration to call for New York Police Department (NYPD) police intervention on campus was made after the Senate Executive Committee explicitly told the administration that the Executive Committee did "not approve the presence of NYPD on our campus at this time."

45. This is in violation of the Charter and Statutes, section 444(f), which requires approval of the Senate Executive Committee to involve external authorities.

46. On April 26, 2024, the University Senate passed a resolution to "unreservedly condemn external interference in the internal affairs of Columbia University that undermines the

10

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 12 of 66

traditions of academic freedom and shared governance," citing a range of activity taken by the University "contrary to the norms and traditions of this University and counterproductive to its mission" including breaches of privacy, due process, and shared governance with the University Senate.

47. In a letter by Columbia Law students to the University Senate on May 6, 2024, the law students extensively critique the jurisdiction and legitimacy of CSSI, especially in the case of Hamilton Hall, "highlight that the Rules anticipate adjudicating violations such as the occupation of Hamilton Hall: 'In the event of an ongoing alleged violation of the Rules (*e.g., protestors occupying University facilities or other sustained disruptions*), the Rules Administrator may initiate the investigations process concurrently with the alleged ongoing violation' (emphasis added)."[6]

48. At the May 8, 2024 meeting of the University Senate, a member of the Rules Committee, Candic Kail, submitted a statement into the record which, in part, reads, "there has been a disregard for the students the University exists to educate, a disregard for the University's Rules and Statutes, and a continued flaunting of the practices of shared governance, to say the least. The administration has not only not course corrected but has doubled down in their bulldozing over any possibility of due process and in their refusal to acknowledge the harm they are doing and have done to this institution and this campus...The administration has not followed the University Statutes and has thwarted the academic mission at a crucial time in the semester for students...We need the CSSI to be disbanded. And we must remove the NYPD and private security from campus and return our campus to students, faculty,

---

[6] University Senate Plenary Binder, May 8, 2024, p.3, *available at* https://senate.columbia.edu/sites/default/files/content/Plenary%20Binders%202023-24/US_Plenary%20Binder_20240508-PP.pdf.

11

staff, and researchers."[7]

49. On May 8, 2024, the University Senate unanimously passed a resolution calling for a halt on ongoing disciplinary proceedings related to protest activity until the Office of the General Counsel provided information on CSSI's jurisdiction to adjudicate these issues and the rules and procedures employed.[8]

50. On May 8, 2024 the Columbia chapter of the American Association of University Professors, introduced a vote of no confidence resolution against President Minouche Shafik. The resolution reads, in part, "President Shafik's violation of the fundamental requirements of academic freedom and shared governance, and her unprecedented assault on students' rights, warrants unequivocal and emphatic condemnation...President Shafik also violated the fundamental obligations of shared governance when she ignored the opinions of the faculty and students on the Senate Executive Committee who unanimously rejected her request to summon armed New York City police onto our campus. The President's choices to ignore our statutes and our norms of academic freedom and shared governance, to have our students arrested, and to impose a lockdown of our campus with continuing police presence, have irrevocably undermined our confidence in her." [9]

51. The vote of no confidence in President Minouche Shafik passed with the support of over 65% of the faculty who voted.[10]

---

[7] *Ibid,* p. 10.

[8] *Ibid*; Sarah Huddleston, "University Senate calls for pause on student protesters' disciplinary proceedings over concerns on proper adjudication," Columbia Spectator, May 9, 2024, *available at* columbiaspectator.com/news/2024/05/09/university-senate-calls-for-pause-on-student-protesters-disciplinary-proceedings-over-concerns-on-proper-adjudication/.

[9] Emma Burris, Columbia Student News, May 8, 2024, *available at,* https://bwog.com/2024/05/columbia-aaup-chapter-introduces-resolution-of-no-confidence-in-president-minouche-shafik/.

[10] *Ibid.*

### *University Tenant Protections*

52. Plaintiffs Curran-Groome and Parisi both leased off-campus apartments from the University located at 434 W. 120th Street. They both had one-year leases with the University that were to expire on May 31, 2024, at which point the plaintiffs would have the option – and so planned – to renew their leases.

53. Upon information and belief, Plaintiffs were given a copy of the University's standard Occupancy Agreement.

54. Upon information and belief, this agreement provides that a "tenancy cannot be cut off before the ending date, except as provided for in this Occupancy Agreement."

55. Upon information and belief, it also provides that "If for any reason Tenant ceases to be a full-time housing eligible student at Columbia University or an affiliated institution, the Occupancy Agreement will end thirty days after such termination and Tenant agrees to vacate the Unit not later than the end of such thirty-day period."

56. Similarly, New York's landlord-tenant law, NY Real Prop L § 210 et seq, provides that landlords may only evict tenants for "Good Cause" and requires landlords to give 30-days notice before terminating a tenancy. NY Real Prop L §§ 215, 228, 232-A.

### **Timeline of Plaintiffs' Engagement with the Student Disciplinary Process**

57. Plaintiff Aidan Parisi is a first-year Master's of Social Work student at Columbia, who prior to their suspension on April 3rd, 2024, was scheduled to graduate in May 2025.

58. Plaintiff Brandon Murphy is a first-year Master's of Social Work student at Columbia, who prior to his suspension on April 18th, 2024, was scheduled to graduate in May 2025.

59. Plaintiff Catherine Curran-Groome is a first year Master's of International Affairs student

13

at Columbia, who prior to her suspension on April 3rd, 2024, and later her effective expulsion, was scheduled to graduate in May 2025.

60. At certain points over the last year and a half, the University has alleged that plaintiffs participated in various on- and off-campus protests, vigils, teach-ins, and other non-violent events to protest Israeli military activity and garner support for a ceasefire in Gaza.

61. On many occasions during this time, the University has substantially departed from its established Rules and policies to unlawfully target and punish plaintiffs for their engagement in such protests, vigils, teach-ins, and other non-violent events.

62. The University did so in order to silence and de facto expel plaintiffs.

63. In this campaign, the University further abrogated its duty to protect Plaintiffs and knowingly subjected them to conditions which led to physical assault, criminalization, emotional trauma, doxxing, discrimination, loss of housing, healthcare, and meal plans, and other forms of harm and harassment.

### *Chemical Weapon Attack Against Plaintiffs Curran-Groome and Parisi*

64. On January 19, 2024, Plaintiffs Parisi and Curran-Groome attended a peaceful on-campus demonstration where they were targeted and assaulted by two Columbia students, Menachem Mendel Perez and Yuval Hadari, both former soldiers in the Israeli military studying at Columbia School of General Studies.[11]

65. Upon information and belief, the University received prior complaints from other students against the assailants prior to the attack, yet did nothing to protect students from their anti-

---

[11] "Professors Slam Columbia's Response to Chemical Skunk Attack on Students at Pro-Palestine Protest," *Democracy Now,* January 25, 2024, *available at* https://www.democracynow.org/2024/1/25/columbia_palestine_protest_attack.

14

Palestinian violence.

66. Upon information and belief, the University received dozens of other complaints of assault and harassment of Arab, Muslim, and pro-Palestinian students prior to the attack, including being spat on, pushed, issued rape and death threats, doxxed, and other forms of bigotry and assault.

67. The two assailants were documented attending a pro-Israel "counter-protest" staged next to the pro-Palestine protest on the Low Steps of Columbia's campus, before donning scarves and sunglasses -- in full view of Columbia Public Safety, New York Police Department, and Columbia University Delegates -- to mask their faces and mixing in with the pro-Palestine crowd. Mendel Perez and Hadari carried canisters from which they sprayed a foul-smelling liquid on the pro-Palestine protestors, including Curran-Groome and Parisi.

68. On information and belief, this foul-smelling liquid was the Israeli military weapon known as skunk spray.

69. Skunk spray is a chemical crowd-control weapon developed in Israel, which is illegal for civilians to possess in the United States and only sold to a limited number of American police forces. The components of the weapon have never been disclosed publicly. Skunk spray has been reported to cause nausea, headaches, fatigue, trouble breathing, coughing, and other medical problems.

70. Curran-Groome and Parisi were both badly injured by the attack.

71. Immediately after the attack, Curran-Groome and other students began to complain about a foul smell. Upon returning home, changing clothes, and showering, they began to communicate about how they couldn't get the smell off their clothes.

15

72. Parisi experienced migraines following the attack. Parisi tried to report their experience to Columbia Public Safety over the phone but was dismissed by a Public Safety officer, stating "well, what do you want me to do about this?"

73. Two days later, on January 21, 2024, Curran-Groome began to have trouble breathing. She went to Columbia's health clinic which diagnosed her with "toxic chemical inhalation." The staff were shocked that a chemical weapon had been used on students on campus and that they had not been notified in order to prepare the necessary services. Columbia's health clinic said they were not equipped to handle her symptoms, and transferred her to Mt. Sinai Hospital for treatment.

74. At Mt. Sinai, Curran-Groome was admitted to the ER and given a chest x-ray, EKG, and two nebulizer treatments. Curran-Groome was tested for COVID, the flu, and other relevant strains, and all tests came back negative. Curran-Groome was discharged from the ER five hours later once her breathing and heart rate had stabilized with recommendations for how to address her symptoms due to "chemical exposure".

75. On January 25th, Curran-Groome was readmitted to the ER after experiencing 7.5 hours of unrelenting vomiting. She was kept on IVs for hours and it was during this time that she was also diagnosed with a heart murmur which had not been present a mere four days earlier.

76. In the months following, Curran-Groome attended follow-up health check-ins at the Columbia health clinic where she received treatment for ongoing vaginal bleeding following the skunk spray attack. Ultimately, Curran-Groome was referred to an off-campus OBGYN clinic to receive specialized treatment. The daily vaginal bleeding continued for five months after the skunk spray attack.

16

77. Curran-Groome also received treatment from her therapist and psychiatrist via Columbia Psychological Services due to the triggering of her Post-Traumatic Stress Disorder ("PTSD") from the attack. The lack of support offered by the Columbia administration led to severe effects on Curran-Groome's physical and mental health.

78. On February 6th, 2024, Curran-Groome emailed numerous administrators at the University in an email detailing previous warnings she had sent the administration of violence against herself and other students as early as November 2023, as well as the litany of harms she faced as a result of this attack. Not a single administrator responded to her email.

79. Mendel Perez was originally suspended for three semesters, but this suspension was lifted as part of a settlement to a lawsuit brought by Mendel Perez against the University, which returned them to their "status quo ante." Hadari received the same original disciplinary measure as Mendel Perez.[12] Both are now active students in good standing at the University.

### *Palestinian Resistance 101, Educational Panel*

80. On March 15, 2024, the Palestine Working Group (PWG) at the School for International and Public Affairs (SIPA), an official student group, submitted an event request through Columbia's online event management system, seeking to host an educational seminar on the afternoon of March 24.

81. Later that day, plaintiff Curran-Groome, a PWG member, followed up with Michael Littlejohn, the Associate Dean of Student Life at the University, about the request.

---

[12] Noah Bernstein, "House committee publishes internal administrative communications, disciplinary information in new antisemitism report," Columbia Sepctator, October 31, 2024, *available at* https://www.columbiaspectator.com/news/2024/10/31/house-committee-publishes-internal-administrative-communications-disciplinary-information-in-new-antisemitism-report/.

17

82. In her email, plaintiff explained that the "goal of the event is to historicize Palestinian resistance beyond the armed resistance which is often at the forefront of news and debate and to discuss the myriad forms of resistance that Palestinians have adopted historically, including dance/dabke, tatreez/sewing, writing/publications, labor organizing/strikes, non-violent marches such as the Great March of Return in 2018, and female led organizing of the 1930s and 1980s."

83. On March 18, Mr. Littlejohn responded and requested the speakers' bios, which Plaintiff provided that same day.

84. On March 19, Mr. Littlejohn notified plaintiff Curran-Groome that he was referring the request to the Special Events Advisory Team ("SEAT") for a "routine review." Plaintiff responded that day to ask why this event would qualify as a "special event" that requires SEAT approval.

85. Littlejohn responded on March 20, promising to get clarity on the SEAT requirements, and telling Plaintiff that because the event was coming up soon, to "please move forward with the off-campus venue" they had previously discussed.

86. On March 22, Littlejohn followed up by email, affirming that the event would require SEAT approval to be held on-campus because one of the speakers "has the potential for significant disruption in the form of counter-protestors." At no time in this letter or otherwise did Littlejohn or any other University official relay concerns about the speakers themselves or the potential content of the discussion.

87. Because of the perceived safety risk of holding the event on campus without SEAT approval, the email concluded that PWG's "options are to move the event to zoom, move it off campus, or move it to another date."

18

88. From this email, plaintiff Curran-Groome reasonably and correctly understood the Associate Dean of Student Life to be authorizing the event to be held off-campus.

89. Accordingly, on March 24, 2024, the event was held off-campus at a student affinity residence known as "Q House" without incident. The event was publicly advertised on social media accounts and open to all Columbia affiliates.

90. Student events are regularly held at student houses like Q House.

91. Organizers were never directed to cancel the event and had no reason to believe they were violating any University policies or directives.

92. Nevertheless, on March 28th, 2024, Columbia's Chief Operating Officer (COO) Cas Holloway ("Holloway") released a statement about the event. In it, he falsely stated that the event was "unsanctioned and unapproved and was held despite multiple cancellations by both Columbia and Barnard. We immediately notified law enforcement and engaged an outside firm led by experienced former law enforcement investigators to conduct an investigation."[13]

93. On Monday, April 1st, 2024, with no prior warning from the University, private investigators ("PIs") came to the residence of Parisi and Curran-Groome. They identified themselves to Parisi as PIs hired by the University, and demanded entry to Parisi's apartment to question them without a lawyer present. Parisi asked them to send a written request and denied them entry.

94. Upon information and belief, this was the first time the University has hired PIs to investigate its own students.

---

[13] Columbia University Public Safety, "Statement from Chief Operating Officer Cas Holloway Regarding March 24th Event," March 28, 2024, *available at* https://publicsafety.columbia.edu/news/statement-chief-operating-officer-cas-holloway-regarding-march-24th-event.

19

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 21 of 66

95. On Tuesday, April 2nd, 2024, Parisi and Curran-Groome received emails from Holloway demanding that they show up for interrogation by the PIs at the Public Safety Office on campus by 5 PM or face "immediate disciplinary measures."

96. As COO, Holloway has no official role in any of the student disciplinary processes based on the Columbia Charter and Statutes or the Standards and Discipline Policy.[14]

97. On Tuesday, April 2nd, 2024, Parisi and Curran-Groome responded to Holloway's email, notifying him that they had retained counsel and were not refusing participation in the investigation, but would need a reasonable amount of time to confer with their attorneys.

98. On Wednesday, April 3rd, 2024, the University's General Counsel's office notified Parisi and Curran-Groome's lawyers that unless the students demonstrated "meaningful cooperation" with the investigation (which they refused to define and said would apply on a case-by-case basis), they would face immediate interim suspension.

99. The University's General Counsel is not authorized to have any sway over student disciplinary decisions.

100.    At 4 PM that afternoon, the University's lawyers called back and notified Parisi and Curran-Groome's lawyers that all students would have to come in for interrogation within 2 hours (by 6 PM), or face immediate interim suspension.

101.    Due to a lack of capacity of the PIs to fulfill their own self-imposed deadline, several students remained in the lobby of the Public Safety office waiting to be interrogated after the 6 PM deadline, whereupon the students' lawyers told them to go home and return in the morning for interrogation, which they communicated to the university's lawyers as

---

[14] "Rules of University Conduct: Disciplinary Process," p. 6, May 8, 2024, https://senate.columbia.edu/sites/default/files/content/Plenary%20Binders%202023-24/US_Plenary%20Binder_20240508-PP.pdf.

20

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 22 of 66

well.

102.     Nevertheless, the same day, April 3rd, 2024, Curran-Groome and Parisi received

notices from CSSI that they were placed on interim suspension.

103.     The notices informed Curran-Groome and Parisi that they was being charged with

various violations of the University's Standards & Discipline policy, including Disruptive

Behavior, Endangerment, Violation of Law, Violation of University Policy, and Failure to

Comply (with the resulting investigation). Curran-Groome and Parisi were informed that

they had "compromised the well-being and safety of the University community by

organizing and participating in an unapproved on-campus event at which non-affiliates

were granted access to a campus residence and which enabled members of the University

community to directly communicate with individuals and/or organizations known to

advocate for violence."

104.     The notice also informed the plaintiffs that they were being placed on interim

suspension "effective immediately and until further notice," in order "to ensure the safety

of the Columbia University community." In addition to barring the plaintiffs from their

classes, campuses, and academic and extracurricular activities, plaintiffs were given 24

hours to vacate their off-campus apartments, leased to them by the University, before their

access would be suspended.

105.     These notices were unlawful, illegitimate, and in violation of the University's

Charters and Statutes because:

   a.   The notices were improperly issued by CSSI, not by the Rules Administrator as

        required;

   b.   The notices improperly issued interim sanctions, despite the fact that:

21

Case 1:25-cv-01606-GHW   Document 1-1   Filed 02/25/25   Page 23 of 66

     i.    The plaintiffs did not present a "danger" to the University community, nor did CSSI ever provide evidence to support such a claim, as required under CSSI's guidelines; and

     ii.   The Rules Administrator and UJB, who have exclusive jurisdiction over this matter, are not authorized to issue interim sanctions.

  c.  The notices were demonstrably false insofar as:

     i.    The event was approved, not "unapproved," by the University;

     ii.   The event did not actually *need* University approval because it was held off-campus;

     iii.  Nothing about the event "compromised the well-being and safety of the University community;" and

     iv.  None of the speakers were "known to advocate for violence" by Plaintiffs nor did they do so at the event.

  d.  The notices were intended to harass, intimidate, and silence plaintiffs Curran-Groome and Parisi, based on the University's perception that they were lead organizers of pro-Palestine advocacy on campus and in retaliation for their complaints about the chemical weapons attack they had suffered on campus less than two months prior.

106.    On Thursday, April 4th, 2024, Parisi wrote to CSSI with an email titled "Extension: Emergency Housing Pending Suspension Appeal" stating that "losing my housing will render me homeless and food insecure", pose "a direct threat to my mental health" and that they were "the sole intern at my practicum and my inability to continue my supportive services will hurt the organization and the participants of the HEAL program I facilitate.

22

This interim suspension not only harms me but also harms countless people who are depending on me."

107.     On Thursday, April 4th, 2024, Holloway emailed Parisi and Curran-Groome regarding the pending interim suspension and appeal, stating that "to date you have refused to cooperate with the University's investigation of the Resistance 101 event on March 24. Your name has been identified as an individual involved in organizing, planning, promoting, and/or attending this unsanctioned and unapproved event.  Because of your refusal to cooperate you have been placed on interim suspension and you have been informed that you must vacate your University housing. I understand you have submitted an appeal to these interim actions that is pending, and we have not enforced you having to vacate housing this evening. We are providing you with a final opportunity to meet with our investigators between 9 AM and 3 PM tomorrow, Friday, April 5, 2024. Please report to the Public Safety Training Room in Low Hall for an interview between 9:00 AM and 3:00 PM tomorrow." The notice clearly indicated that the interim suspension would only be lifted if Parisi and Curran-Groome agreed to meet with the private investigators the following day.

108.     Yet on April 5th, 2024, Parisi and Curran-Groome were notified by the Associate Vice President for Student Success and Intervention that "it is not appropriate to remove the interim measures at this time." This communication illustrates another instance in which the University departed from its own stated procedures in order to leverage Parisi and Curran-Groome's housing and food security to pressure them into waiving their rights and assisting the ongoing investigation against them.

109.     Curran-Groome and Parisi were also banned from campus under this interim

23

suspension order, depriving them of access to the campus health clinic and psychological services center. Curran-Groome had been receiving services from both the health clinic and Columbia Psychological Services (CPS) following the skunk attack she suffered on campus, and her access to these in-person services was cut off damaging her physical and mental health.

110.    Curran-Groome was furthermore deprived of her access to the Office of Disability Services through which she was registered as a student with a disability, and was deprived of access to her on campus job as a Research Assistance which was her sole source of income.

111.    In the ensuing investigation which took over three months to conclude, Columbia never furnished any evidence that Parisi or Curran-Groome were a threat or danger to themselves, the university, or any individuals or property related to the Columbia community, meaning that CSSI never had any evidence to support the interim suspension imposed against them.

112.    Curran-Groome and Parisi also did not have the opportunity to adjudicate their case through the CSSI hearing process until May 22, over 45 days after into their interim suspensions, and did not receive a final disposition until June 25, after over 75 days of unjust, interim suspensions against them.

113.    This caused both Parisi and Curran-Groome to lose credit for core courses due to the lack of due process, leading to further financial damage as Columbia's SIPA revoked Curran-Groome's full scholarship due to these incomplete classes. For Parisi, they were unable to complete a required course (only offered in the Spring semester) in order to continue on to the second year of their studies and graduate with their Master's in Social

24

Work, meaning that Parisi will be forced to pay for an extra semester of school in order to complete this course and graduate.

114.     In a June 25, 2024 email to the Associate Vice President of CSSI, Curran-Groome complained about the lack of due process and collateral effects of placing her and Parisi on indefinite suspension for over three months while awaiting their hearings and ultimate decisions. She stated "Not only was my evidence file provided to me over a month after I requested it (in violation of CSSI's own stated timeline), but a hearing was not scheduled for over 50 days, during which time I lost access to my housing, my on-campus federal work study position, my access to physical and psychological health services, as well as my central purpose for being at Columbia - my classes. Due to the unending nature of this so-called *'interim suspension,'* CSSI's mishandling of this case has forced me to receive incompletes for classes which I had already completed over half the coursework for. The extent of the emotional and psychological damage caused by this unending punishment process is truly cruel and unusual. During my hearing [on May 22nd] I was told that a decision regarding the outcome of my case would be made swiftly. That was a month ago. On June 17th, I received correspondence from CSSI stating that the timeline would again be delayed, and that I would receive an outcome letter by Tuesday, June 25th. It is past the close of business on June 25th and once again CSSI is delaying and denying even the sham of justice that is the current state of this university's discipline processes."

115.     A "final decision" was only rendered for Parisi and Curran-Groome following Curran-Groome's email on June 25th, in which both Plaintiffs were notified by CSSI that they had been found to have violated three provisions of the school's Standards and Discipline Policy: Disruptive Behavior, Violation of University Policy, and Failure to

25

Comply. Plaintiffs were placed on Conditional Disciplinary Probation for one year, without addressing the damages they had suffered during three months of interim suspension.

116.     Holloway's communication with Parisi and Curran-Groome, as well as with their lawyers, demonstrates that interim suspension was used initially as an extortionate threat and ultimately as a form of punishment by Holloway, in an attempt to force Parisi and Curran-Groome to attend interrogations with private investigators.

117.     In summation, the University's investigation and suspensions of Parisi and Curran-Groome occurred outside the bounds of Columbia's written disciplinary procedures. The University also unlawfully used the students' access to shelter, healthcare, and education as means to retaliate and to compel their submission to an improper and illegitimate disciplinary process. The administration rushed an interim suspension order against the students in less than 48 hours from the time the students received inquiry notices by email, without providing any evidence to substantiate the allegations made against them. In the end, Columbia delayed any disciplinary hearings for Curran-Groome and Parisi until May 22nd, 2024, and their ultimate sanction was not released until June 25th, 2024, which resulted in 1 year of disciplinary probation. Nevertheless, Columbia did nothing to ameliorate or repair the damages of the 3 months of unjust interim suspensions against them, including evicting them from their homes, suspending their access to healthcare, banning them from campus, loss of an on-campus job, as well as not allowing them to attend and complete courses which led to delayed graduation and the revocation of a full scholarship.

*First Gaza Solidarity Encampment Protest*

118.     On April 17th, 2024 at 4:30 AM, over 100 students erected tents on the University's

26

East Lawn which formed Columbia's Gaza Solidarity Encampment.

119.     The East and West Lawns were two of Columbia's only designated "Free Speech Zones" where students had the right to protest per the Demonstrations and Events Policy.

120.      After 30 hours of continuous non-violent protest, at approximately 1 PM on April 18h, 2024, President Shafik overrode the decision of the University Senate, and invited the NYPD onto campus to violently arrest plaintiff Curran-Groome and over 100 other protestors.

121.     On April 19th, 2024, the chapters of the American Association of University Professors ("AAUP") at Columbia and Barnard, censured President Shafik's decision to invite the NYPD onto campus. In the vote of no confidence passed by the AAUP two weeks later in May, the AAUP referenced "President Shafik's statement that the original Gaza Solidarity Encampment's protesters posed a 'clear and present danger.' Calling this statement 'false,' the AAUP also cited NYPD Chief of Patrol John Chell's remark that the protesters 'were peaceful, offered no resistance whatsoever, and were saying what they wanted to say in a peaceful manner.'"[15]

122.     Curran-Groome's charges, as well as those of all the protestors at the first encampment, were dropped by the New York City's District Attorney's office.

123.     On April 19th, 2024, CSSI notified plaintiff Murphy that he was under investigation and placed on interim suspension "effective immediately and until further notice." The letter cited alleged "disruptive behavior," "vandalism," and other violations of the University's "Standards and Disciplines" guidelines, based on plaintiff Murphy's alleged presence at the student encampment on April 17.

---

[15] Emma Burris, *Columbia Student News,* May 8, 2024, available at https://bwog.com/2024/05/columbia-aaup-chapter-introduces-resolution-of-no-confidence-in-president-minouche-shafik/.

27

124.     Despite repeated requests, CSSI never provided any evidence that plaintiff Murphy was present at the encampment, engaged in these alleged behaviors, or otherwise presented any safety risk to himself or the University community.

125.     By placing plaintiff Murphy on immediate and indefinite suspension, the University caused plaintiff Murphy substantial and irreparable harm. This includes the loss of his tuition payments and the credits earned towards his degree that semester, as well as the loss of the health care plan he depended on to seek regular medical care. The status of his full scholarship at the University is also uncertain. Plaintiff Murphy was also unable to continue with his practicum internship as a high school counselor for low-income immigrant students in the Bronx, forcing him to abruptly cease this vital work and abandon his young and extremely vulnerable clients. Plaintiff Murphy also had his address and contact information doxxed, causing him and his loved ones to be harassed online. As a result of his interim suspension and its foreseeable consequences, Plaintiff Murphy has suffered from depression, anxiety, and severe emotional distress.

126.     Also on April 19th, 2024, CSSI emailed plaintiff Curran-Groome, alleging that she had "failed to comply with the directives of your Interim Suspension," despite again providing no evidence to justify these allegations. CSSI never shared any evidence with Curran-Groome regarding her presence at the first encampment or justifying the original interim suspension from April 3rd regarding the Palestinian Resistance 101 event.

127.     On April 19th, 2024, Columbia's Assistant Rules Administrator Weiping Wu charged Plaintiff Catherine Curran-Groome with violating Rules of Conduct 443.a(9) (remaining without authorization), (16) (refusing to self-identify), (19) (failure to disperse), and (20) (same), again based on her alleged presence at the student encampment.

28

128.     On April 23rd, 2024, Murphy sent an email to CSSI appealing his interim suspension and detailing the litany of harms this interim suspension was causing himself and his clients.

129.     The University did not even respond to Murphy's appeal request, leaving him in an indefinite disciplinary purgatory that continues to this day.

130.     Instead, on April 30, 2024, CSSI sent a letter to plaintiff Murphy, charging him with a range of additional violations of CSSI's "Standards & Discipline," due to his alleged presence at the student encampment, and again placing him on "interim suspension."

131.     The University's decision to leverage additional charges instead of processing his appeal was intended to be punitive and retaliatory against plaintiff Murphy's alleged activism and advocacy in his defense.

132.     Despite CSSI claiming that the interim suspensions from the first encampment remain active to this day against Curran-Groome and Murphy, CSSI never had any legitimate role in adjudicating protest and free speech related matters, as these matters fall squarely under the purview of the UJB per the University's governing Charter and Statutes.

133.     On July 12th, 2024 Curran-Groome and Murphy received notices from CSSI that "your case regarding the 4/18 Encampment is being transferred over to Rules [UJB] for further review and the Rules administrators will be in touch regarding next steps."

134.     On September 10th, 2024, five months after the first encampment and five months into their interim suspensions, Curran-Groome and Murphy received notices from the Rules Administrator that they were pursuing four charges against them from the first encampment including: unauthorized access to the lawn, refusal to self-identify, and two seemingly identical charges for failure to disperse.

29

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 31 of 66

135.     Curran-Groome and Murphy immediately replied with their signed responses of "not responsible" to all charges.

136.     As of December 20th, 2024, eight months after the first encampment, Curran-Groome and Murphy remain in disciplinary purgatory as CSSI claims that they both still have active interim suspensions against them from the first encampment, despite the case being transferred to the UJB. On December 20th, 2024, the UJB notified Plaintiffs Curran-Groome and Murphy of disciplinary hearings scheduled regarding the encampment the following week.

137.     Murphy requested a one- or two-week delay so that he would have time to consult with his counsel following the holidays, the Rules Clerk rejected this request.

138.     Curran-Groome notified the UJB that she had already been *de facto* expelled by CSSI over this matter, and requested assurance that UJB's assumption of jurisdiction meant that CSSI's decision was being overturned. The Rules Clerk responded that they would be proceeding with the hearing and did not address her concern around CSSI's illegitimate expulsion.

139.     These matters arising from the April 18th student encampment were entirely outside of CSSI's jurisdiction and should have been adjudicated by the UJB within the two months of the alleged incident, pursuant to the Rules of Conduct which govern student protest activity.

140.     CSSI repeatedly exceeded its authority by conducting investigations, initiating disciplinary procedures, and issuing sanctions regarding the April 18th student encampment pursuant to the "Standards and Discipline" guidelines, as well as by placing

30

the plaintiffs on interim suspension, when the matter should have been handled by the Rules Administrator and adjudicated by the UJB pursuant to the Rules of Conduct.

141.     The University took these actions knowing that they violated the students' rights and the University's rules, in order to silence the student's protected speech.

### *Second Gaza Solidarity Encampment, "Human Chain"*

142.     On July 23rd, 2024, plaintiffs Parisi and Curran-Groome received notices from CSSI that alleged they "were involved in the April 21, 2024 human chain to forcibly exclude others from the South lawn of Columbia University's Morningside campus. This is not a disciplinary meeting, but your attendance and participation is mandatory in order for us to determine the next best steps in following up to this report."

143.     On August 2nd, 2024, CSSI notified Curran-Groome and Parisi that they were scheduling Disciplinary Hearings via the "Dean's Discipline" process against them for August 13th, 2024. In this notice, CSSI alleged that they had violated the "Columbia University Non-Discrimination Policy" and engaged in "Disruptive Behavior."

144.     At the hearing, the sole piece of evidence being used against them was a video which had been published on social media that clearly documented a human chain being formed by protestors in the encampment as a defensive, safety precaution against three individuals who had entered the encampment and were filming people without consent. In other words, the "human chain" had no discriminatory purpose, and was only intended to protect the safety of people being filmed.

145.     Curran-Groome and Parisi arrive halfway through the video, never join the "human chain," instead ask people on both sides to take a step back, and ask the three individuals to please stop filming and invite them to talk on the side, using textbook de-escalation

31

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 33 of 66

techniques. When accused of targeting them for their beliefs, Curran-Groome explicitly states in the video, "I do not claim to know anything about you or your beliefs." She then goes on to once again ask for de-escalation.

146.    Later, one of the three students thanked Curran-Groome for being kind and helping to de-escalate the situation.

147.    Nonetheless, CSSI repeatedly and baselessly insisted that the "human chain" was aimed at excluding Jewish people from the encampment, even though many Jewish people were already present and welcomed at the encampment, including some who participated in the "human chain."

148.    On September 10th, 2024, Parisi and Curran-Groome received notices from CSSI that they were sanctioned with an extended year of disciplinary probation, if Columbia allowed them to return following their suspensions, due to the unfounded claim that they had violated the "non-discrimination policy."

149.    In the decision letter for Curran-Groome, CSSI claimed that, "while we acknowledge and do not discredit your statement during the August 13, 2024 disciplinary hearing that you stepped in to try and deescalate the situation by asking the group of about three students to leave, specifically because of a safety concern for the protesters being filmed by the students without consent, the de-escalation attempt still resulted in excluding those students from the South Lawn and therefore had a discriminatory impact."

150.    This was manifestly inaccurate, as Curran-Groome was heard in the video inviting the students to stay and sit with her on the side and discuss, and never asked them to leave. Instead, the three students decided of their own volition to leave the camp as could be seen in the video and other videos readily available on social media.

32

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 34 of 66

### *Hamilton Hall Protest*

151.    On April 29th, 2024, approximately 50 people occupied a University building known as Hamilton Hall on the University's main campus, while hundreds more rallied outside of the building, drawing on a history of similar protests in the building over recent decades.

152.    On April 30th, Minouche Shafik again invited the NYPD onto campus to break up the protest, leading to one of the most violent police raids on students in history.

153.    Many students including the plaintiffs were injured during the NYPD raid, including suffering burns from flash grenades and fractured eye sockets. A live bullet was even discharged inside the building.

154.    Curran-Groome was injured severely enough by the NYPD that she was taken handcuffed and with police escort, on an ambulance to the Harlem Hospital for Children and Families. She was discharged after a wound on her leg was glued shut, pain medication administered, and x-rays taken of her ankle, chest, elbow, humerus, lumbar spine and thoracic spine. Her hospital paperwork diagnosed her with "Injury due to physical assault; Laceration of right ankle, initial encounter; Acute right ankle pain; Left arm pain; Acute bilateral back pain."

155.    Curran-Groome was then taken to the precinct, before being admitted to central booking alongside 50 other alleged protestors.

156.    Despite being one of over 30 students who allegedly entered Hamilton Hall during the nonviolent protest, Curran-Groome was the only Columbia student whose charges were not immediately dismissed by the District Attorney (DA).

157.    On information and belief, Curran-Groome was singled out by the DA at the request

33

of the University.

158.     On May 1st, 2024, CSSI notified Parisi, Murphy and Curran-Groome that they were under investigation for several "egregious violations" of the Standards & Discipline guidelines, regarding their alleged presence at the Hamilton Hall protest. The notice also informed them that they had "been immediately suspended and banned from Columbia University with the expectation that you will be permanently expelled after an expedited hearing."

159.     On May 5th, 2024, CSSI directed Parisi, Murphy and Curran-Groome to attend a hearing five days later, on May 10th, and informed them that they would not be permitted to bring counsel despite all three undergoing active criminal cases with the New York City District Attorney's Office. These hearings were then cancelled by CSSI, with a statement that they would be rescheduled. They were not.

160.     On June 14th, 2024, Murphy, Curran-Groome, and Parisi received notices from CSSI stating that their cases stemming from the student encampment and Hamilton Hall protest were being transferred to the Rules Administrator and UJB.

161.     On June 28th, 2024 the Rules Administrator, Dr. Omar Torres, emailed Curran-Groome, Murphy, and Parisi, requesting to schedule "interviews" in relation to the Hamilton Hall protest, alleging 14 violations of the Rules of University Conduct.

162.     On July 12th, 2024, plaintiff Murphy responded to Dr. Torres to request access to the evidence file, per his rights under the Rules of University Conduct. He did not receive this file from Dr. Torres until August 13th, giving him only one day to prepare for his interview with Dr. Torres on August 14th.

163.     On July 23 and 24, 2024, Dr. Torres interviewed plaintiffs Curran-Groome, Murphy

34

and Parisi, wherein Dr. Torres relied upon sealed police reports as the sole basis of its evidence against the plaintiffs.

164.    At the time of this interview, the documents had been automatically sealed under New York's criminal records sealing law, CPL 160.50, when the plaintiffs' criminal cases were favorably terminated with dismissals.

165.    New York law forbids the private possession or use of these sealed documents, including arrest records and charging documents.

166.    The University unlawfully and improperly relied on these documents as the sole basis for its charges against the plaintiffs. *See Lino v. City of New York,* 958 N.Y.S.2d 11 (N.Y. Supp. Ct., 1st Dept, 2012).

167.    The University implicitly acknowledged that possession of these documents was unlawful, since, after the plaintiffs' charges were dismissed, the University deleted screenshots of the plaintiffs' docket entries from their disciplinary files and investigative reports.

168.    Less than five hours after her interview with Dr. Torres, CSSI emailed Curran-Groome notifying her that she was under investigation for new charges related to the second encampment on July 21st.

169.    This constituted a pattern of the University's, wherein CSSI was used to pursue charges against the plaintiffs when they felt that the UJB's discipline would not be as harsh as they desired.

170.    In an email on July 24, 2024, CSSI affirmed that all three interim suspensions against Curran-Groome were still in effect against her.

171.    This was contrary to University policy, as (a) the cases had been transferred to the

35

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 37 of 66

Rules Administrator due to CSSI's lack of jurisdiction, and the Rules Administrator lacks authority to order interim suspensions; (b) CSSI had offered no evidence in any case for over 10 months, and (c) plaintiff's initial case had already been resolved with a final sanction of one year of disciplinary probation.

172.    Despite the fact that his case had been transferred to UJB, plaintiff Murphy was notified by CSSI on August 23, 2024 that he was being suspended for one year as punishment for violating the terms of his interim suspension through his alleged presence at the April 30th Hamilton Hall protest. His appeal was denied on September 23rd, 2024.

173.    On August 30th, 2024, Dr. Torres emailed Curran-Groome, Murphy and Parisi notifying them that they had been officially charged with 14 rules violations. All three plaintiffs responded to the charges as "not responsible."

174.    In early September 2024, after being asked whether she agreed with then-President Shafik's decision to authorize the NYPD to enter campus and conduct arrests on two occasions, Interim President Armstrong said, "if you could just let everybody know who was hurt by that, that I'm just incredibly sorry" and "I know it wasn't me, but I'm really sorry. … I saw it, and I'm really sorry."[16]

175.    In December 2024, plaintiffs Murphy, Parisi, and Curran-Groome received notices of hearings from the UJB, requiring them to come in for hearings a week later. This came over eight months after their alleged involvement in the campus protests in explicit violation of the timeline procedures pledged in the Charter and Statutes.

176.    Plaintiffs Murphy and Parisi were denied requests to reschedule or rescind their

---

[16] Esha Karam, Shea Vance, & Sarah Huddleston, "'I'm really sorry': Armstrong apologizes to those 'hurt' by NYPD sweeps," *Columbia Spectator*, Sept. 19, 2024, p.4, *available at* https://www.columbiaspectator.com/news/2024/09/19/im-reallysorry-armstrong-apologizes-to-those-hurt-by-nypd-sweeps/.

36

hearings, despite the fact that the hearings were scheduled during the winter break and holiday season, conflicted with plaintiff's work schedules, afforded them only two scant weeks to prepare, and constituted double jeopardy for sanctions already issued by CSSI.

177.     Nevertheless, on January 6th, 2025, after denying Plaintiffs' previous requests, the UJB announced without providing any reasoning that they would be rescheduling Plaintiffs' hearings. As of this filing, the UJB still has not conducted said hearings, nor finished an adjudication process they dragged on for over eight months, without any individualized evidence against Plaintiffs.

### *Interim Suspension Violations Pursued by CSSI*

178.     On July 18th, 2024, Curran-Groome, Murphy and Parisi received notices from CSSI, alleging that they had "violated [their] Interim Suspension directives" on May 1st.

179.     The following day, Curran-Groome responded that she already had a hearing scheduled with the UJB on the same matter the following week, per the University's decision to transfer their cases.

180.     CSSI responded that the plaintiffs were being investigated for "the violation of your interim suspension stemming from Resistance 101, and the April 18, 2024 encampment arrest, which was neither addressed in prior CSSI cases nor falls under the jurisdiction of Rules/UJB. Rules/ UJB may be hearing matters related to the encampment but not the violation of the interim suspension itself."

181.     In mid-August, 2024, Curran-Groome, Murphy and Parisi attended CSSI hearings for their alleged "interim suspension violations."

182.     For plaintiffs Murphy and Parisi, the only evidence CSSI offered to support these alleged violations were illegally obtained, sealed arrest records.

37

183. Curran-Groome continued to argue in her hearing that she had never been provided with evidence to legitimate the original interim suspension against her (nor the two that followed), which would prove she was a danger to herself or the University community, as required in the case of interim suspensions.

184. After her hearing, Curran-Groome followed up with the hearing officers within 24 hours to provide requested documentation establishing that the initial interim suspension was the result of a coercive threat by Holloway attempting to force her and Parisi to attend an interrogation with PIs.

185. On August 23rd, 2024, Curran-Groome, Murphy and Parisi received decision letters from CSSI, finding all three to be guilty of violating their interim suspensions. They were each suspended from their respective schools "effective immediately"; Curran-Groome for two years, and Murphy and Parisi for one, and ordered to be placed on Disciplinary Probation for one year upon returning. These suspensions included bans from campus, stipulations that Plaintiffs could not pursue studies at any other school during the suspension unless they withdrew from Columbia, and required that they meet with CSSI officers regularly during the suspension and that these officers would ultimately have the power to decide if Plaintiffs would be allowed to return to the University once their suspensions were complete.

186. Upon information and belief, Curran-Groome, an Arab American woman, received the most severe sanction any student at the University has received for protest related activity since the 1968 protests, despite being one of over two hundred students arrested during the April 2024 protests at the University.

187. The same day as the plaintiffs were suspended, the University Senate released new

"Guidelines to the Rules of University Conduct."[17]

188.     These Guidelines "reassert the primacy of the Rules process as the appropriate mechanism for resolving disciplinary matters connected to demonstrations, protests, and the like." They also establish a new mechanism for issuing Interim Sanctions "if there is an imminent need to protect the physical safety and security of the Columbia community and/or to prevent further substantial and persistent disruption of academic activities."

189.     By creating this new mechanism, the Senate implicitly acknowledged that the Rules Administrator did not have this power before.

190.     In September 2024, appeals by plaintiffs Curran-Groome, Murphy and Parisi were rejected by their respective Deans.

191.     On November, 13th, 2024, the Associate Dean of SIPA informed Curran-Groome that her full-tuition scholarship, worth over $100,000, had been revoked. "SIPA's merit-based scholarships require that a student remain in good academic standing... As of now, you are not in good academic standing because you have two or more incompletes on your record from spring 2024 and you are also not otherwise in good standing due to your suspension and subsequent disciplinary probation status. Therefore, if you return to SIPA, you will not be eligible for your scholarship." The incompletes as well as the suspension, were the result of CSSI's illegitimate interim suspension orders against Curran-Groome.

192.     Although the scholarship required "academic good standing," Curran-Groome's scholarship was revoked despite her GPA being a 3.89, demonstrating the University's continued pattern of targeting Curran-Groome. The University knew that Curran-Groome

---

[17] Columbia University Senate, "The Guidelines to the Rules of University Conduct," Aug. 23, 2024, *available at* https://senate.columbia.edu/sites/default/files/content/CommitteeRules%20of%20University%20Conduct/USThe%20Guidelines%20to%20the%20Rules%20of%20University%20ConductEndorsed%2020240823.pdf.

39

could not afford her degree without this full scholarship, as it was originally allocated to her on the basis of both need and merit. Nevertheless, they rescinded it knowing that this was equivalent to an expulsion and that Curran-Groome would not be able to return to the University.

### *Improper External Influences on Disciplinary Procedures and Violations of Students Privacy Rights*

193.     After collecting 50,000 pages of documents from the University, the U.S. House Committee on Education and the Workforce issued a report on October 31, 2024, which included internal communications regarding the University's attempts to punish the plaintiffs for their political activity.

194.     A focus of these communications was how to funnel "repeat offenders" (in other words, perceived student leaders) into the CSSI process instead of through the Rules Administrator. "Moving the cases to the UJB would almost certainly result in significantly weaker punishments than CSSI.," the report notes.[18]

195.     In a May 29, 2024 exchange published in the report between Shafik and Claire Shipman and David Greenwald (co-chairs of the board of trustees), Shafik wrote that the Senate had rejected a dual process that would have put the students through both the CSSI and the UJB processes. She then brought up a new proposal that would put those arrested at Hamilton Hall through the Rules and put the seven "repeat offenders" through CSSI. Greenwald and Shipman expressed concern that this process would not "meet the board's

---

[18] House Committee on Education and the Workforce, "Republican Staff Report: Antisemitism on College Campuses Exposed," October 31, 2024, p. 21, *Available at* https://edworkforce.house.gov/uploadedfiles/10.30.24_committee_on_education_and_the_workforce_republican_staff_report_-_antisemitism_on_college_campuses_exposed.pdf.

40

expectations."

196.    Board of Trustee members (and the Board as a whole) are explicitly outside of the
disciplinary mechanisms as laid out in the University's Charter and Statutes, yet they
successfully pressured President Shafik and the administration to apply harsher punishment
against plaintiffs.

197.    On August 19, 2024, the House Committee, chaired by Republican Congress
member Foxx, released a report and press release critiquing the University's handling of
disciplinary cases against students involved in the encampments and Hamilton Hall
protest.[19] Foxx said in a press release, "The failure of Columbia's invertebrate
administration to hold accountable students who violate university rules and break the law
is disgraceful and unacceptable."[20]

198.    Four days later, CSSI issued suspensions against plaintiffs Curran-Groome,
Murphy, and Parisi.

199.    U.S. Congress members are also outside of the disciplinary mechanisms as laid out
in the University's Charter and Statutes, yet one successfully pressured the University to
apply harsher punishment against the plaintiffs.

200.    In a June 5, 2024, exchange between University Provost Angela Olinto and Interim
Provost Dennis Mitchell, Olinto wrote that since the Rules "speak directly to the issue of
building occupations," the University "came to the view that the proper and legitimate way
to handle these cases" is through the UJB. Nonetheless, she affirmed that the "repeat

---

[19] House Committee on Education and the Workforce, "Columbia University Disciplinary Stats," August 8, 2024,
*available at* https://edworkforce.house.gov/uploadedfiles/8.8.24_columbia_discipline_stats.png.

[20] House Committee on Education and the Workforce Press Release, "Foxx: Columbia's Refusal to Enforce Rules
Against Antisemites is Disgraceful: Committee Receives Documents Showcasing Shocking Discipline Failures at
Columbia," August 19, 2024, *available at*
https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=411857.

41

offenders" would undergo the CSSI process. Mitchell responded, "I agree fully."

201.     The following month, CSSI initiated proceedings against the plaintiffs for allegedly violating their illegitimate interim suspensions, eventually leading to their final suspension orders.

202.     University Provosts are outside of the disciplinary mechanisms as laid out in the University's Charter and Statutes, yet successfully pressured the University to apply harsher punishment against the plaintiffs.

203.     Billionaires and the Mayor of New York City are also outside of the disciplinary mechanisms as laid out in the University's Charter and Statutes, yet they successfully pressured the University to call the police on to campus to arrest plaintiffs and other protestors. The group of billionaires had a call with the Mayor shortly before the arrests, and promised political donations while asking the Mayor "how the business leaders could urge Columbia's president and trustees to permit the mayor to send police on campus."[21]

### *Doxxing*

204.     On April 11th, plaintiff Parisi was doxxed by Columbia Professor Shai Davidai for the first time. On this date, Davidai posted an article including the student's social media and student status at the Columbia School of Social Work with the apparent intention of inviting harm and harassment to a student.[22]

205.     On April 18th, following the initial doxxing by Davidai, Parisi's sister was contacted via private message on Instagram stating, "tell your faggot brother to stop posting

---

[21] Middle East Eye, "US billionaires joined Whatsapp group to 'change Israel narrative,'" May 17, 2024, available at https://www.middleeasteye.net/news/us-billionaires-financiers-change-israel-narrative-whatsapp-group.
[22] Shai Davidai, X, April 11, 2024, https://x.com/ShaiDavidai/status/1778409643741478973.

42

shit or your whole family will get what's coming to them." This led to a widespread fear of the student and their family's safety.

206.     On April 23rd, Parisi was doxxed by Columbia Professor Shai Davidai again. This time, Davidai posted pictures of Parisi and falsely stated that Parisi had invited "a PFLP terrorist to campus."[23]

207.     On April 29th, Parisi and their mother were doxxed by Columbia Professor Shai Davidai. This time, Davidai shared Parisi's mother's employment details with the apparent intention of jeopardizing a student's family's employment and inviting harm and harassment to a student and their family.[24]

208.     Parisi formally reported incidents of doxxing, including those involving Davidai, to Columbia CSSI officials during multiple disciplinary hearings held between June and August. While the officials acknowledged the harm caused by these incidents, they failed to follow up with Parisi or provide any measures to support or ensure their safety.

209.     Upon information and belief, Davidai had been reported to the University by students, staff, and faculty dozens of times prior to his doxxing of Parisi, due to his harassment, intimidation, and doxxing of numerous students based on their race, ethnicity, religion and/or support for the Palestinian cause. This included doxxing an underage student on his Twitter, leading to death threats against them, which resulted in no formal sanctions from the University.

210.     Davidai is an Advisory Board member of Documenting Jew Hatred on Campus, a group that has continuously doxxed and harassed numerous students, including Curran-

---

[23] Shai Davidai, X, April 23, 2024, https://x.com/ShaiDavidai/status/1782783177829888296.

[24] Shai Davidai, X, April 29, 2024, https://x.com/ShaiDavidai/status/1784999562303684673.

43

Case 1:25-cv-01606-GHW          Document 1-1          Filed 02/25/25          Page 45 of 66

Groome and Parisi, since April. Davidai, through his involvement with this external organization, publically pressured the University to expel, sanction, and employ police violence on Curran-Groome and Parisi.[25]

211.     Columbia students launched a petition on April 9th, 2024, which garnered over 8,000 signatures and was delivered to the Columbia administration, calling on Columbia to terminate Davidai's contract for "bully[ing] pro-Palestine students of color with complete impunity despite being untenured."[26]

212.     Davidai was only temporarily banned from campus after he was accused of harassing two administrators, COO Cas Holloway and Deputy Director of Public Safety Bobby Lau.[27] Demonstrating a pattern of conduct by the University of wilful negligence regarding their duty to protect their students if those students support the Palestinian cause, yet they are fully capable of taking the necessary measures to protect their own administrators.

213.     On May 1st, Parisi, Curran-Groome, and Murphy were doxxed by the NYPD following President Minouche Shafik's decision to invite the NYPD onto campus to indiscriminately attack and arrest students. The NYPD then released the names, addresses, and ages of the students to the press and media, leading to widespread doxxing and

---

[25] Documenting Jew Hatred on Campus at Columbia U, X, April 25, 2024, *available at* https://x.com/CampusJewHate/status/1783361182031748003; Documenting Jew Hatred on Campus at Columbia U, X, April 27, 2024, *available at* https://x.com/CampusJewHate/status/1780557618559242628; Documenting Jew Hatred on Campus at Columbia U, X, May 23, 2024, *available at* https://x.com/CampusJewHate/status/1793728346313851241.

[26] Joseph Zuloaga, "SJP petition calls for termination of Business School professor Shai Davidai," April 19, 2024, Columbia Spectator, *available at* https://www.columbiaspectator.com/news/2024/04/17/sjp-petition-calls-for-termination-of-business-school-professor-shai-davidai/.

[27] Rebecca Massel, "Columbia suspends Shai Davidai's campus access after he allegedly 'harassed and intimidated' University employees," Columbia Spectator, October 16, 2024, *available at* https://www.columbiaspectator.com/news/2024/10/16/columbia-suspends-shai-davidais-campus-access-after-he-allegedly-harassed-and-intimidated-university-employees/.

44

harassment, including of family members whose addresses were published.[28]

214.    Following the May 1st doxxing, plaintiffs Curran-Groome, Murphy, and Parisi were contacted numerous times on their personal cell phones and social media accounts by media outlets and members of the public seeking to harass them.

215.    For example, on May 5th, Parisi was doxxed by an X account named "Viral News NYC". The account included a picture of Parisi's police photograph and falsely stated that Parisi "ALLEGEDLY BOASTED TO STUDENTS ABOUT HAVING CONNECTIONS WITH HAMAS."[29]

### *House Committee on Education and the Workforce Request for Student Records*

216.    In February 2024, the U.S. House Committee on Education and the Workforce ("House Committee") sent a letter to the University requesting the production of documents pertaining to criticism of Israel and pro-Palestinian speech, including private FERPA-protected student disciplinary files.[30] Specifically, the House Committee requested:

i.    "A list of all student disciplinary/conduct cases relating to alleged antisemitic incidents since October 7, 2023, or conduct related to the Gaza Solidarity Encampment, including the complete case files, and showing: the date; a brief description of the incident; undergraduate/graduate status and school of the alleged perpetrator; entity responsible for reviewing the case (including whether the incident is going through Dean's Discipline or the

---

[28] The site has since been taken down, but plaintiffs retained a copy.

[29] Viral News NYC, X, May 5, 2024, https://x.com/ViralNewsNYC/status/1787200124352917754.

[30] Letter from Chairwoman Foxx to Columbia University, August 1, 2024, https://edworkforce.house.gov/uploadedfiles/8-1-24_foxx_letter_to_columbia.pdf.

45

University Judicial Board/University Senate process(es)); case status; actions taken by Columbia (including any modification of proposed or imposed discipline); and the standing of the alleged perpetrator (good standing, suspended, expelled, etc). Specify which incidents are related to the encampment and the occupation of Hamilton Hall."[31]

217.    On April 17, 2024, President Minouche Shafik, Professor Schizer, and Co-Chairs of the Board of Trustees Claire Shipman and David Greenwald, testified before the House Committee regarding alleged antisemitism at the University.

218.    During the hearing, Chair of the House Committee Congresswoman Foxx specifically references the details of Plaintiff Curran-Groome's ongoing disciplinary case, even though Curran-Groome herself had not yet been provided with her evidence file, a hearing, or adjudication.

219.    In providing details of an ongoing disciplinary case to the House Committee, in violation of Curran-Groome's FERPA rights, the Columbia administration knowingly endangered Plaintiff, while violating her privacy and due process rights.

220.    Specifically, Congresswoman Foxx says, "one of those organizers and speaker at this unapproved, pro-Hamas rally, was a student already suspended for hosting an affiliate of a terrorist organization, do you agree that this continued defiance further aggravates the severity of the violations by the suspended student?"[32] To which President Shafik confirmed the plaintiff's disciplinary status.

---

[31] Letter from Chairwoman Foxx to Columbia University, August 1, 2024, https://edworkforce.house.gov/uploadedfiles/8-1-24_foxx_letter_to_columbia.pdf.

[32] Annie Ma, "WATCH: Columbia University's president testifies at House antisemitism hearing," PBS News Hour, April 17, 2024, *available at* https://www.pbs.org/newshour/politics/watch-live-columbia-universitys-president-testifies-at-house-antisemitism-hearing.

46

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 48 of 66

221.    In fact, Curran-Groome's disciplinary cases were still pending and would not receive hearings for another month.

222.    Upon information and belief, Columbia voluntarily provided student disciplinary files to the House Committee.[33]

223.    Student disciplinary files contain the personal identifying information of students, including, but not limited to, legal names, email addresses, degree information, and physical addresses.

224.    On October 31, 2024, the House Committee released a 325-page report titled, "Antisemitism on College Campuses Exposed," based on the documents provided by Columbia and other universities.[34] The report details the Plaintiffs active pending disciplinary cases as well as the outcomes of other cases.

225.    Student disciplinary records are confidential under the University's rules as well as FERPA, and the University assures students they will never be disclosed to third parties without the student's consent, even as it has now released such records voluntarily to the House Committee.

226.    Student disciplinary records contain information about the student that can be hurtful, embarrassing, would subject them to public censure, and interfere with their ability to obtain or keep gainful employment.

---

[33] Letter from Chairwoman Foxx to Columbia University, August 1, 2024, https://edworkforce.house.gov/uploadedfiles/8-1-24_foxx_letter_to_columbia.pdf; Noah Bernstein, "House committee publishes internal administrative communications, disciplinary information in new antisemitism report," Columbia Sepctator, October 31, 2024, *available at* https://www.columbiaspectator.com/news/2024/10/31/house-committee-publishes-internal-administrative-communications-disciplinary-information-in-new-antisemitism-report/ .

[34] House Committee on Education and the Workforce, "Republican Staff Report: Antisemitism on College Campuses Exposed," October 31, 2024, *available at* https://edworkforce.house.gov/uploadedfiles/10.30.24_committee_on_education_and_the_workforce_republican_staff_report_-_antisemitism_on_college_campuses_exposed.pdf.

47

227.    The University improperly redacted the plaintiffs' disciplinary files, leading to the unlawful disclosure of their personally identifying information.

228.    The House Committee has no legal obligation, nor has it made any promise, to keep any information received from the University or any other source confidential but remains free to distribute it to the press and to members, include it in releases, reports and letters, or post it on the Internet--all of which it has already done.

**First Cause of Action**
**Discrimination and Retaliation**
**under Title VI of the Civil Rights Act of 1964,**
**42 U.S.C. § 2000d**

229.    Paragraphs 1 through 228 are re-alleged.

230.    The University receives federal financial assistance.[35]

231.    Between September 1st, 2023 and December 31st, 2024, the University engaged in a purposefully discriminatory course of conduct that involved repeatedly deviating from its established mandates regarding expressive activity and student discipline in order to silence the plaintiffs' legitimate protest activities and remove them from campus life. This includes subjecting plaintiffs to draconian, opaque, and illegitimate disciplinary procedures that caused them to lose their scholarships, academic credit, housing, health benefits, and suffer a range of other harms. In so doing, the University fully rescinded the plaintiffs' ability to participate in or benefit from the services, activities, or privileges provided by the University.

---

[35] Columbia University, "Columbia Research," *available at* https://research.columbia.edu/federal-agency-forums#:~:text=Federal%20agencies%20provide%20about%20$800,ranging%2C%20agency%2Dfunded%20projects, ("Federal agencies provide about $800 million annually to fund research across every school and campus at the university and a total of $1.1B including direct support of education and contributions to help sustain the underlying research infrastructure").

48

232.    The University had actual notice of severe and pervasive discrimination against Palestinian, Arab, Muslim, and students supporting Palestine on campus, including from one of the Plaintiffs as early as November, 2024. The University possessed enough knowledge of the harassment that it reasonably should have implemented deterrence measures.

233.    The University also created a racially hostile environment on campus, including by characterizing the plaintiffs and their associates as antisemitic, promoters of terrorism, and disorderly, by restricting their ability to congregate and engage in protected speech, by repeatedly calling in the NYPD to arrest them in violation of established norms and protocols, by sharing their personal information with the U.S. Congress, media, and others, and by failing to protect them from or adequately discipline the perpetrators of a chemical weapons assault against them.

234.    The University engaged in this discriminatory campaign in part due to the plaintiffs' race and national origin, as plaintiff Curran-Groome was targeted for being a Lebanese American engaged in protected speech regarding her racial and national identity.

235.    The University also targeted the plaintiffs based upon their affiliation and solidarity with Palestinian students and people, creating the conditions for reverse discrimination.

236.    The University also retaliated against the plaintiffs for opposing this unlawful practice or policy.

237.    Additionally, the University engaged in intentional harassment through its knowledge of and deliberate indifference to the severe harassment, including threats, defamation, and assault, that the plaintiffs faced from students and faculty who were under the University's substantial control. *See Zeno v. Pine Plains Cent. Sch. Dist.,* 702 F.3d 655,

49

666 (2d Cir. 2012) (*citing Davis v. Monroe County Board of Ed.,* 526 U.S. 629, 643-650 (1999)).

238.     Moreover, the University created a hostile environment through its failure to take prompt and effective steps to end the harassment, eliminate the hostile environment, prevent its recurrence, and address its effects, thereby severely injuring the plaintiffs and depriving them of access to their education. *See* U.S. Dep't of Education, Office for Civil Rights, Racial Incidents and Harassment Against Students at Educational Institutions, 59 Fed. Reg. 11,448, 11,449 (Mar. 10, 1994); *see also Zeno*, 702 F.3d at 666 ("Educational benefits include an academic environment free from racial hostility."); *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 356 (S.D.N.Y. 2014) (same).

239.     By treating plaintiffs differently and causing them harm because of their race, ethnicity, and affiliations, as well as by creating a racially hostile environment on the University's campus, and by retaliating against their opposition to this unlawful practice or policy, the University violated Title VI of the Civil Rights Act of 1968.

240.     As a direct and proximate result of the University's actions and inactions in violation of Title VI, the Plaintiffs have sustained substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

241.     Accordingly, Plaintiffs are entitled to all relief available under Title VI, including damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Columbia to: (i) reverse the outcome, findings, and sanction described hereinabove; (ii) expunge Plaintiff's

50

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 52 of 66

disciplinary record with respect to the allegations described hereinabove; (iii) remove any record of the finding and/or Plaintiffs' suspension from their educational file/disciplinary records/transcript; and (iv) any and all further actions required to return Plaintiff to the status quo ante.

## Second Cause of Action
### New York Human Rights Law, NY Exec. Law § 290 et seq.

242.    Paragraphs 2 through 241 are re-alleged.

243.    By targeting the plaintiffs to suppress their protected speech and creating a hostile environment in which they were assaulted by other students, the school failed to provide an education free of discrimination or harassment based on the plaintiffs' racial identities and national origin.

244.    The environment at the University, which has been rendered hostile for the Plaintiffs, is sufficiently severe, pervasive, persistent, and offensive such that it deprives them of equal access to the opportunities and benefits that Columbia provides to other students.

245.    By illegitimately rescinding pro-Palestine student organization designations while allowing pro-Israel organizations to remain, by restricting and denying access to campus facilities for events and protests, by failing to stop student-on-student bullying and assault, by placing plaintiffs on "interim suspension" and subjecting them to other sham disciplinary measures without due process, the University denied plaintiffs the use of its facility by reason of their race and national origin. *See* NY Exec. Law 296(4).

246.    By leveraging additional punishments for violating this "interim suspension" and returning to campus to protest, the University retaliated against the plaintiffs for opposing their unlawfully discriminatory practice. *See* NY Exec. Law 296(7).

51

247.      Plaintiffs' support of the Palestinian people has also subjected them all to anti-Palestinian discrimination by the University, bringing them within the protections of New York Human Rights Law for reverse discrimination.

248.      This conduct violates the New York Human Rights Law.

249.      As a direct and proximate result of the University's actions and inactions in violation of New York Human Rights Law, Plaintiffs sustained substantial injury, damage, and loss, including, but not limited to: emotional distress, physical harm, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

250.      Accordingly, Plaintiffs are entitled to all relief available under New York Human Rights Law, including damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Columbia to: (i) reverse the outcome, findings, and sanction described hereinabove; (ii) expunge Plaintiff's disciplinary record with respect to the allegations described hereinabove; (iii) remove any record of the finding and/or Plaintiffs' suspension from their educational file/disciplinary records/transcript; and (iv) any and all further actions required to return Plaintiff to the status quo ante.

### Third Cause of Action
### New York City Admin. Code § 8-107(4)

251.      Paragraphs 1 through 250 are re-alleged.

252.      New York City Admin. Code § 8-107(4) (the "NYC Code") prohibits the University from subjecting Plaintiffs to discrimination or harassment, based on their race, creed, national origin, or their support of another protected group, the Palestinian people.

52

253.  The NYC Code also protects Plaintiffs against reverse discrimination.

254.  The acts and omissions of the University and its administrators and other employees have subjected and continue to subject Plaintiffs to discrimination and harassment that is severe and pervasive.

255.  The plaintiffs have suffered, and continue to suffer, substantial damages including emotional pain, suffering, inconvenience, loss of enjoyment of life, loss of housing, loss of healthcare and psychological services, loss of employment, physical assault, harassment, and other non-pecuniary losses.

256.  As a direct and proximate result of the University's actions and inactions in violation of the NYC Code, Plaintiffs sustained substantial injury, damage, and loss, including, but not limited to: emotional distress, physical harm, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

257.  Accordingly, Plaintiffs are entitled to all relief available under the NYC Code, including damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Columbia to: (i) reverse the outcome, findings, and sanction described hereinabove; (ii) expunge Plaintiffs' disciplinary records with respect to the allegations described hereinabove; (iii) remove any record of the finding and/or Plaintiffs' suspensions from their educational file/disciplinary records/transcript; and (iv) any and all further actions required to return Plaintiffs to the status quo ante.

258.  Per NYCHRL § 8-502, Plaintiff will serve notice of this complaint upon the City Commission on Human Rights and the Corporation Counsel.

53

## Fourth Cause of Action
## Violation of *Tedeschi* Rights

259.        Paragraphs 1 through 258 are re-alleged.

260.        Under *Tedeschi v. Wagner College,* 49 N.Y.2d 652 (1980), a private university

must strictly observe and grant the procedural and substantive rights it promises its students

in its manuals and codes.

261.        The University similarly has an implied obligation of good faith and fair dealing in

its relations with the plaintiffs.

262.        The University promises its students due process, equal protection, and academic

freedom in its Student Manual and Charters and Statutes, as well as the confidentiality of

their records, including disciplinary files.

263.        The University also must not retaliate against students for their First Amendment

protected personal opinions stated in academic or nonacademic environments.

264.        Instead of protecting the plaintiffs, as their Tedeschi rights mandated, the

University enthusiastically and willfully punished them for their criticism of Israel and

support for the Palestinian people.

265.        The University's violations of plaintiffs' Tedeschi Rights include, but are not

limited to:

    a.    The University's deliberate willful failure to protect plaintiffs Curran-Groome and

        Parisi from foreseeable and repeated harassment, threats, and assault, including

        their January 19, 2024 assault by two University students and their repeated doxing

        and harassment by a University professor and others, as well as the University's

        retaliation against the plaintiffs for complaining about these incidents, in violation

        of Charters and Statutes §§ 440, 444(f), 446 and New York law. *See, e.g., Jane Doe*

54

*v. Sarah Lawrence College,* 19-CV-10028 (PMH), 2020 WL 1819914, at \*10 (S.D.N.Y. Apr. 4, 2020) (finding that a university has a duty to protect its students from situations in which it "has taken affirmative steps to supervise and control [an] activity."), *quoting Jane Doe v. Union College*, 1:19 CV-284 (GLS/CFH), 2020 WL 1063063, at \*8 (N.D.N.Y. Mar. 5, 2020); *Faiaz v. Colgate University,* 26 F.Supp.3d 336 (N.D.N.Y. 2014).

b. The University's decision to have CSSI conduct investigations, hold hearings, issue interim suspensions, and issue final sanctions against the plaintiffs in order to deny due process rights they were entitled to under the Rules of Conduct, when CSSI lacked jurisdiction over these matters under Charters and Statutes § 442;

c. The University's repeated decision to place the plaintiffs on interim suspension via CSSI despite no evidence that they posed a threat to the school's operations, property, themselves or others (and despite no evidence of wrongdoing at all), in violation of Standards and Discipline Section IV;

d. The University's improper capitulation to outside influences, including the University Board of Trustees, the U.S. House Committee on Education and the Workforce, the New York City Mayor, NYPD, and various wealthy individuals, in agreeing to divert the plaintiffs' cases from the Rules Administrator to CSSI, to issue excessive punishments, and take other punitive actions;

e. The University's decision to extend the plaintiffs' illegitimate "interim suspension" indefinitely in order to effectively expel the students without due process, in violation of Charters and Statutes § 442 and Standards and Discipline Section IV;

f. The University's use of this illegitimate and unfounded interim suspension as a

55

pretext to later target plaintiffs Curran-Groome and Parisi with additional disciplinary actions, in an effort to silence their protest activity and remove them from campus, in violation of Standards and Discipline § 440 and the University's broad and numerous commitments to the protection of free expression.

g.  The University's decision to influence the NYPD to single out plaintiff Curran-Groome for harsher legal punishment, as well as other punitive actions, based on her race, ethnicity, and/or political opinions, and in retaliation for her complaints and expressive conduct, in violation of the University's anti-discrimination policy, Standards and Discipline §§ 440, 446, and state and federal law;

h.  The University's decision to keep the plaintiffs on indefinite interim suspension for over nine-months as of this filing, even after the underlying charges had been resolved and/or jurisdiction has been transferred to the Rules Administrator, in violation of Rules and Conduct § 442 and Standards and Discipline Section IV;

i.  The University's consistent pattern of denying plaintiffs due process and sabotaging their defenses, *inter alia,* by (a) denying them access to the evidence against them; (b) delaying charges and denying them a hearing on their charges to leave them on indefinite "interim suspension," then (c) providing only one week's notice of their hearing, and (d) denying their requests for short (one- or two-week) continuances so that they may confer with their attorneys and request time off work, in violation of Charters and Statutes §§ 446-8 and Standards and Discipline Section IV;

j.   The University's repeated pattern of issuing sanctions against the plaintiffs that were not consistent with the University's handling of similar cases, in violation of

56

Rules and Conduct § 449 and Standards and Discipline Section IV;

k.  The University's unlawful reliance on sealed police reports as its sole source of evidence against the plaintiff for many of their charges, in violation of state law;

l.  The University's decision to charge and convict the plaintiffs of disciplinary violations despite the University's willful and knowing disregard of plaintiffs' actual innocence in order to silence and effectively expel them, in violation of Standards and Discipline §§ 440, 444, 446;

m.  The University's decision to share the plaintiffs' confidential student disciplinary records with the U.S. House Committee, NYPD, and others, in violation of Charters and Statutes § 446 and federal law;

n.  The University's March 2024 decision to use the pretext of requiring "SEAT" approval to deny plaintiff Curran-Groome permission to host the Palestinian Resistance 101 event on-campus, when the event did not qualify as a "special event," in violation of established University policy;

o.  The administration's April 2024 decisions to have COO Holloway and the General Counsel threaten, initiate, and administer student discipline against plaintiffs Curran-Groome and Parisi, including by issuing interim suspensions, when neither party is authorized to do so under the University's Charters and Statutes, *see* § 55, *cf.* § 442;

p.   The administration's April 1, 2024 decision to send Private Investigators to the plaintiffs homes without advance notice, in violation of Charters and Statutes § 446;

q.  The administration's April 2024 decisions requiring plaintiffs Curran-Groome and Parisi cooperate with the private investigators or face "immediate disciplinary

Case 1:25-cv-01606-GHW     Document 1-1     Filed 02/25/25     Page 59 of 66

measures," in violation of Charters and Statutes § 446;

r.  The University's selective, biased, and retaliatory use of its disciplinary procedures by targeting plaintiff Curran-Groome and Parisi for allegedly "attending an unsanctioned and unapproved event," when hundreds of other students attended the same (sanctioned and approved) event yet faced no consequences, in violation of Charters and Statutes §§ 440, 442-444, 446, 449 and Standards and Discipline Sections II and IV;

s.   The University's decision on April 19, 2024 to call the police onto campus without Senate authorization and in direct opposition of the Senate's demands, in violation of Charters and Statutes § 444(f);

t.  The University's April 19, 2024 decision to place plaintiff Murphy on "interim suspension" through CSSI's disciplinary procedures based on the plaintiffs mere alleged presence at the student encampment, despite (a) its failure to offer any evidence of its claims; (b) its failure to allege that plaintiff Murphy presented a threat to the school's operations or safety; and (c) CSSI's lack of jurisdiction over protest-related activity, all in violation of established University policy;

u.  The University's decision to ignore plaintiff Murphy's appeal of his interim suspension, in violation of established University policy;

v.  The University's April 30, 2024 decision to leverage additional charges against plaintiff Murphy in retaliation for his appeal of his interim suspension and self-advocacy, in violation of established University policy;

w.  The University's repeated tactic of leveraging the plaintiffs' access to housing, food, and health care to compel their submission to an unfair, biased, and

58

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 60 of 66

illegitimate disciplinary procedure, in violation of established University policy;

x.   The University's decision to ignore the Senate's May 8, 2024 resolution to suspend CSSI disciplinary proceedings related to protest activity, in violation of established University policy;

y.   The University's decision not to share the students' evidentiary files before their hearings, in violation of Charters and Statutes §444, 446-8;

z.   The University's unreasonable delay of over 50 days to provide plaintiffs with a hearing and over 75 days to provide final dispositions, in violation of Charters and Statutes §§ 446-9 and Standards and Discipline Section IV;

aa.  The University's failure to lift these interim suspension orders once the underlying cases had been transferred to UJB or resolved with a final order, in violation of Charters and Statutes § 442 and Standards and Discipline Section IV;

bb.  Evicting the plaintiffs without 30 days' notice and without good cause, in violation of the plaintiff's lease with the University and NY Real Prop L § 210 *et seq*;

cc.  The University's April 30, 2024 decision to invite the NYPD onto campus to violently arrest the plaintiffs and others, in violation of Charters and Statutes §§ 440, 444(f), 446, and New York law. *See, e.g., Jane Doe v. Sarah Lawrence College,* 2020 WL 1819914, at *10; *Jane Doe v. Union College,* 2020 WL 1063063, at *8.

dd.  The University's May 1 notification that the plaintiffs had been "immediately suspended and banned from Columbia University with the expectation that [they would] be permanently expelled after an expedited hearing," in violation of established University policy.

59

ee. The University's May 5, 2024 decision to deny plaintiffs access to counsel during their hearings, in violation of established University policy.

ff. The University's July 23, 2024 decision to institute additional CSSI proceedings against plaintiff Curran-Groome once it appeared that the UJB proceedings would not carry a stiff enough punishment, in violation of established University policy.

gg. The University's decision to suspend plaintiffs for their alleged participation in the Hamilton Hall protest when (a) this matter fell under the jurisdiction of the Rules Administrator, not CSSI; and (b) the University's sole source of evidence was a sealed arrest report, in violation of established University policy.

hh. The University's September 10, 2024 decision to bring four additional disciplinary charges against plaintiffs Curran-Groome and Murphy based on their alleged presence at the first encampment (after previous charges against them for this conduct had been resolved) a full five months after the incident and five months into their interim suspension, in violation of established University policy.

ii. The University's December 2024 decision to bring additional charges over eight months after the campus protests and its ongoing delay in providing hearings for these matters, in violation of established University policy.

266. The University's violations of the plaintiffs' Tedeschi Rights has inflicted severe damage on their education and their personal well-being.As a proximate and foreseeable consequence of the foregoing breaches, Plaintiffs sustained damages including, but not limited to: emotional distress, physical harm, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

60

267.    As a result, Plaintiffs are entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### Fifth Cause of Action
### Breach of Contract

268.    Paragraphs 1 through 267 are re-alleged.

269.    The Universities' aforementioned breaches of its own charters, rules, guidelines, and policies constitute breaches of its contractual obligations with the plaintiffs.

270.    Plaintiffs adequately performed their part of the contract.

271.    The University's unilateral breaches of contract caused the plaintiffs damages in the form of lost tuition, scholarships, housing, medical coverage, and meal plans, as well as other financial, physical, reputational, and emotional harms.

272.    As a result, Plaintiffs are entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### Sixth Cause of Action
### Negligence

273.    Paragraphs 1 through 272 are re-alleged.

274.    At all times, the University had a duty not to harm the plaintiffs, as well as a duty to protect the plaintiffs from harm during activities that it has taken affirmative steps to supervise and control.

275.    The University breached this duty by repeatedly calling in the police to violently arrest the plaintiffs and others, and by improperly singling them out for draconian and illegitimate disciplinary measures.

276.    The University further breached this duty by failing to take reasonable steps to protect the students from assault and harassment by other students and faculty who were

61

known to be abusive towards the plaintiffs and others.

277.      The University's breach of this duty foreseeably caused the plaintiffs to sustain damages.

278.      As a result, Plaintiffs are entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### Seventh Cause of Action
### Intentional Infliction of Emotional Distress

279.      Paragraphs 1 through 278 are re-alleged.

280.      The University repeatedly singled out the plaintiffs for unwarranted scrutiny and harassment, including by disregarding its established disciplinary procedures to unlawfully persecute the plaintiffs based on their protected status and speech.

281.      The University pursued this course of conduct with the presumption that the plaintiffs would be suspended or expelled, evicted without notice, lose their healthcare, meal plans, and other benefits, get doxed, threatened, and assaulted, and suffer widespread and compounding harms to their careers, livelihoods, reputations, family relationships, and mental health.

282.      Indeed, as a foreseeable result of the University's conduct, the plaintiffs have suffered severe emotional and psychological harm, including anxiety, depression, and trauma for which they are each seeking treatment.

283.      Through this willful course of conduct, the University engaged in extreme and outrageous behavior that exceeds all bounds of decency.

284.      The University engaged in this course of conduct with the knowledge or conscious disregard of a high likelihood that their conduct would cause the plaintiffs severe emotional

62

distress.

285.    As the proximate cause of these harms, the University is liable for the intentional infliction of plaintiff's severe emotional distress. See *Brown v. N.Y. Design Ctr., Inc.*, 185 N.Y.S.3d 97, 100-01 (App. Div. 2023) (citing Howell v New York Post Co., 81 N.Y.2d 115, 121 (1993);  *Klein v Metropolitan Child Servs., Inc.*, 100 A.D.3d 708, 710 (2d Dept 2012)).

286.    As a direct and proximate result of the University's actions and inactions, Plaintiffs sustained substantial emotional damages.

### Eight Cause of Action
### Negligent Infliction of Emotional Distress

287.    Paragraphs 1 through 286 are re-alleged.

288.    The University owed Plaintiffs a duty of care, as it was bound to afford plaintiffs the rights and privileges enumerated in its Charters and Statutes as well as to observe the disciplinary procedures outlined therein.

289.    The University breached this duty of care by failing to afford plaintiffs their freedoms of speech and association, due process rights, and other protections guaranteed by its Charters and Statutes, and by instead pursuing *ad hoc* disciplinary procedures where the outcome was presumed to illegitimately punish the plaintiffs for their protected status and speech. The University also breached this duty of care by returning Mendel-Perez and Hadari, who admitted to attacking plaintiffs Curran-Groome and Parisi, to campus with complete disregard for the psychological harm and hostile environment this would cause Plaintiffs.

290.    This breach of the University's duty of care unreasonably endangered the plaintiffs and caused them to fear for their safety, causing them severe emotional distress as a result.

63

Plaintiffs lost their access to health care, housing, meal plans, financial aid, and more. They were doxxed, threatened, and harassed. Their educational goals have been on hold, and their reputations and careers have been irreparably harmed.

291.    As the proximate cause of the plaintiffs' harms, the University is liable for the negligent infliction of the plaintiffs' severe emotional distress.

## Ninth Cause of Action

## Violations of New York Landlord-Tenant Law

292.    Paragraphs 1 through 291 are re-alleged.

293.    By evicting the plaintiffs Curran-Groome and Parisi from University housing without good cause and without 30-days notice, the University violated New York's landlord-tenant law, NY Real Prop L §§ 215, 228, 232-A.

## Tenth Cause of Action
## Declaration

294.    Paragraphs 1 through 293 are re-alleged.

295.    Plaintiffs respectfully request this Court to issue its declaration as to the respective rights, responsibilities and liabilities of the parties, upon the facts as proven in this proceeding.

WHEREFORE Plaintiff demands judgment on the First through Ninth Causes of Action, in an amount of damages to be determined by this Court; on the Tenth Cause of Action, in the form of a declaration; together with such other and further relief as may be just and proper, and the costs and disbursements of this action.

64

Case 1:25-cv-01606-GHW    Document 1-1    Filed 02/25/25    Page 66 of 66

DATED: Amagansett, New York
February    2025

/s/ Jonathan Wallace
Jonathan Wallace
PO #728
Amagansett NY 11930
917-359-6234
jonathan.wallace80@gmail.com
Attorney for Plaintiffs

65